IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID KUTSCHER,                         )       CASE NO. 1:13CV1389
                                        )
                 Plaintiff,             )
                                        )
            v.                          )       MAGISTRATE JUDGE
                                        )       KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL,                 )
SECURITY ADMINISTRATION,                )
                                        )       **MEMORANDUM OPINION AND ORDER**
                 Defendant.             )


Plaintiff David Kutscher ("Plaintiff" or "Kutscher") challenges the final decision of the

Commissioner of Social Security ("Defendant" or "Commissioner"), denying his application for

supplemental social security income ("SSI") under Title XVI of the Social Security Act.  Doc. 1.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 14.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.


## I.   Procedural History

Kutscher protectively filed an application for SSI on April 16, 2010,[1] alleging a disability

onset date of September 8, 2009.  Tr. 181.  He alleged disability based on mental illness, an

anxiety disorder, and anger issues.  Tr. 89, 185.  Kutscher's application was denied by the state

agency initially (Tr. 88, 101) and on reconsideration (Tr. 98, 100).  On October 26, 2011, a

hearing was held before Administrative Law Judge Frederick Andreas ("ALJ").  Tr. 27-79.

---

[1] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents.
http://www.ssdrc.com/disabilityquestionsmain20.html (Last visited 8/05/14).

In his January 20, 2012, decision (Tr. 10-26), the ALJ determined that Kutscher's residual functional capacity ("RFC") did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled.  Tr. 20-21.  Kutscher requested review of the ALJ's decision by the Appeals Council.  Tr. 9.  On May 13, 2013, the Appeals Council denied Kutscher's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Pertinent Medical History

#### 1.        Treatment Notes - Mental Impairments

**Signature Health.**  On June 4, 2009, Kutscher underwent a mental health diagnostic assessment at Signature Health.  Tr. 290.  A social worker noted that Kutscher met the criteria for intermittent explosive disorder, mood disorder, and polysubstance dependence full partial remission with rule out antisocial personality disorder.  Tr. 290.   On July 7, 2009, Kutscher underwent a psychiatric evaluation through Todd Gates, O.D.  Tr. 332-33.  Dr. Gates noted Kutscher's anxious mood and that he suffered from intermittent explosive disorder, generalized anxiety disorder, insomnia, gastroesophageal reflux disease ("GERD"), and moderate psychosocial stressors.  Tr. 333.  Dr. Gates assigned a global assessment of functioning ("GAF") score of 55.[2]  Tr. 333.

On August 11, 2009, Kutscher told Dr. Gates that the stressors in his life had improved but he did not want to take the prescribed medication for his sleep issues because he feared

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

negative side effects.  Tr. 334.  Dr. Gates gave Kutscher a trial of Doxepin to deal with his difficulties sleeping.  Tr. 334.  On September 8, 2009, Kutscher presented to Dr. Gates with anger issues, severe depression, and panic attacks.  Tr. 335.  During an individual counseling session on September 14, 2009, Kutscher stated that he wanted help dealing with his "rage" issues and wanted to be less angry.  Tr. 302.  On September 28, 2009, Kutscher described frequent, violent nightmares.  Tr. 304.

During an individual counseling session on October 12, 2009, Kutscher reported keeping his feelings of anger, fear, frustration, worthlessness, and rejection bottled up so he does not "hurt people."  Tr. 305.  During a medication management session with Dr. Gates on October 21, 2009, the doctor noted, "we are very concerned about his anger" and increased Kutscher's dosage of Zoloft at the patient's request.  Tr. 336.  The next week, at his individual counseling session, Kutscher became anxious at the mention of traumatic childhood experiences and past feelings of anger but reported that he was now able to control his actions when he wanted to.  Tr. 307.  In his next counseling session on November 23, 2009, Kutscher reported coloring to keep calm.  Tr. 309.

On January 8, 2010, Kutscher reported his success in using coloring as a coping skill and progress in controlling his anger.  Tr. 313.  On January 26, 2010, Dr. Gates noted that Kutscher was sleeping better with his Klonopin prescription but increased his Zoloft dosage to deal with his anxiety and depression.  Tr. 337.  On February 22, 2010, after the death of his grandson, Kutscher stated to his counselor that his medications were not working to control his anger and he "forgets" to use coping skills.  Tr. 320.  The next day, Dr. Gates noted that, in addition to intermittent explosive disorder, Kutscher suffered from posttraumatic stress disorder and

attention deficit disorder.  Tr. 338.  Due to unfavorable side effects, Kutscher's prescription for Zoloft was replaced with Wellbutrin.  Tr. 338.

On March 3, 2010, Kutscher's wife called to report that her husband was experiencing increased mood swings and was verbally aggressive.  Tr. 323.   On March 8, 2010, Kutscher's counselor noted that he still had difficulty expressing his emotions for fear of what would happen if he did.  Tr. 324.  Kutscher rated his anger as a 9 out of 10 (10 being "rage") at his counseling session on March 22, 2010.  Tr. 326.  The next day, Dr. Gates noted that Kutscher was "doing better" on Lexapro and Klonopin, but that Kutscher no longer wanted to take Wellbutrin due to negative side effects.  Tr. 339.

On May 12, 2010, Dr. Gates prescribed Depakote to help deal with Kutscher's aggressiveness and encouraged him to attend anger management classes.  Tr. 340.  On June 29, 2010, Dr. Gates discontinued Kutscher's Depakote dosage in favor of Pristiq.  Tr. 389.  On July 27, 2010, Dr. Gates noted that Kutscher suffered from attention deficit hyperactivity disorder in adulthood, bipolar disorder, and acute grief reaction after his wife left him.  Tr. 390.   After reconciling with his wife, Kutscher reported feeling optimistic about the future and Dr. Gates noted that his medications were working well.  Tr. 391.  On October 20, 2010, Kutscher was doing well except for having difficulty sleeping at night; Dr. Gates prescribed Seroquel.  Tr. 393. On November 24, 2010, Kutscher reported that he was doing okay and that his medications helped his problems with mood swings, irritability, and bad temper.  Tr. 394.  He also stated that he was sleeping well and did not wish to make any changes to his medications.  Tr. 394.

On January 26, 2011, Kutscher reported that he was "overall doing his best" as his relationship with his wife was good and his medications were working well.  Tr. 416.  On March 16, 2011, he again reported that his medications were working well and things were going well

in his marriage.  Tr. 417.  On April 27, 2011, Kutscher reported some trouble sleeping, but other than increasing his sleeping pill, no other changes were made to his medications.  Tr. 419.  On June 28 2011, Kutscher reported feeling anger as a result of a traumatic incident involving his wife.  Tr. 424.  Dr. Gates noted that Kutscher had enough insight not to act upon his rage.  Tr. 424.

### 2.    Treatments Notes - Physical Impairments

**Northcoast Family Practice.**  Kutscher underwent primary care medical treatment at Northcoast Family Practice between October 2009 and September 2010 for various complaints but largely for gastrointestinal issues.  Tr. 345-59, 364-79.  In June 2010, Kutscher reported that he was experiencing no joint swelling, joint paint, weakness, or back pain.  Tr. 345.

**University Hospital Medical Practices.**  On December 17, 2009, and January 14, 2010, Kutscher received cervical epidural steroid injections from Sami Moufawad, M.D., at University Hospitals to treat cervical radiculitis.  Tr. 280-85.  A March 9, 2010, x-ray of his spine did not show any abnormalities.  Tr. 279.  There are two treatment notes from Dr. Moufawad from May 6, 2011, which appear to contradict each other.  Tr. 426-29.  In the first treatment note, Kutscher stated that the pain in his lower back and lower limbs was better after the steroid injections.  Tr. 426.  He also reported that he had been experiencing right upper limb pain and had been dropping objects.  Id.  Dr. Moufawad scheduled an electromagnetic study ("EMG") to "better understand the pain in the right upper limb."  Id.  In the second May 6, 2011, treatment note, Dr. Moufawad reported that the pain in Kutscher's lower limbs was getting worse.  Tr. 428-29.  Dr. Moufawad recommended Kutscher continue treating with Percocet and Tramadol.  Tr. 429.  He also injected Kutscher's right shoulder with a steroid, per Kutscher's request.  Id.

5

A June 13, 2011, x-ray revealed an intact stabilization plate extending from the C5-C6 level and no significant neural foraminal narrowing, canal stenosis, or disc bulging.  Tr. 430.  A July 5, 2011, EMG revealed "right focal Median neuropathy at the wrist indicative of right carpal tunnel syndrome."  Tr. 432.

**Geneva Clinic.**  Kutscher presented to the Geneva Clinic as a new patient on June 9, 2011.  Tr. 414.  Upon physical examination, Kutscher was found to have severe neck tenderness.  Tr. 414.  It was also noted that Kutscher's reflexes were intact in his upper and lower extremities and there was normal tone and power in his upper extremities.  Id.

### B.  Medical Opinion Evidence

### 1.    Plaintiff's Treating Sources

**Dr. Todd Gates.**  Dr. Gates had been treating Kutscher since July 2009.  Tr. 383.  On January 26, 2011, Dr. Gates completed a mental status questionnaire ("MSQ") and a daily activities questionnaire ("DAQ").[3]  Tr. 383-87.  In the MSQ, Dr. Gates diagnosed Kutscher with bipolar depression, PTSD, and ADHD, and noted that Kutscher suffered from severe anxiety.  Tr. 383-84.  Dr. Gates opined that Kutscher had "much difficulty" with social interaction and with maintaining attention.  Tr. 384.  He also opined that Kutscher had impaired concentration and could not "stay on task or complete things timely."  Tr. 384.  Finally Dr. Gates stated that Kutscher could not handle work related stressors.  Tr. 384.  In the DAQ, Dr. Gates noted that Kutscher was able to shop and drive/take public transportation without difficulty, but that he had some difficulty completing household chores and keeping up with personal hygiene.  Tr. 387.  In response to the question: "Describe how the client got along with former employers, supervisors,

---

[3] Dr. Gates did not date the mental status questionnaire (Tr.383-85).  The daily activities questionnaire, which appears to have been filled out at the same time, was dated January 26, 2011 (Tr. 386-87).

and co-workers," Dr. Gates opined: "cannot maintain employment" and "unable to work."  Tr. 386.

### 2.     State Agency Opinions

**Dr. Vicki Warren.**  On August 12, 2010, state agency psychologist Vicki Warren, Ph.D., noted that, although Kutscher's anxiety and personality disorders were severe, they did not meet the requirements of a Listing.[4]  Tr. 83.  She rated Kutscher as "moderate" in: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence and pace.  Tr. 83.  Kutscher had no repeated episodes of decomposition.  Tr. 83.

Dr. Warren also assessed Kutscher's mental residual functional capacity using a checklist of 12 categories.  Tr. 84-86.  She rated Kutscher as "moderately limited" in his ability to: (1) understand and remember detailed instructions; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) respond appropriately to changes in the work setting.  Tr. 84-86.  She rated Kutscher as "not significantly limited" in the remaining categories.  Tr. 84-86.  Dr. Warren also opined that Kutscher's ability to interact with supervisors and coworkers was moderately impaired.  Tr. 85-86.  Finally, Dr. Warren determined that Kutscher could perform a wide range of work in which social interactions are limited, tasks are simple and repetitive, stress is low, and there are no strict production standards.  Tr. 86.

---

[4] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

**<u>Dr. Robelyn Marlow.</u>** On February 28, 2011, psychologist Robelyn Marlow, Ph.D., determined that, although Kutscher's anxiety and personality disorders were severe, they did not meet the criteria of a Listing.  Tr. 94.  Dr. Marlow rated Kutscher's as "moderate" in: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence or pace.  Tr. 94.  Kutscher did not have any repeated episodes of decompensation.  Tr. 94.

Dr. Marlow also assessed Kutscher's mental residual functional capacity using a list of 20 categories.  Tr. 95-97.  He rated Kutscher as "not significantly limited" in 14 categories.  Tr. 95-97.  Dr. Marlow rated Kutscher as "moderately limited" in his ability to: (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting.  Tr. 95-97.  Dr. Marlow also stated that Kutscher could perform a wide range of work in which social interactions are limited, tasks are simple and repetitive, stress is low, and there are no strict production standards.  Tr. 97.

**<u>Dr. Elizabeth Das.</u>**  On October 22, 2010, state agency medical consultant Elizabeth Das, M.D., opined that Kutscher "does not have a severe physical impairment that limits his ability to work."  Tr. 380.  She noted that Kutscher claims he has a bad back, carpal tunnel syndrome, and is nearly blind but stated that he "denies all of these allegations when he goes to the doctor and has a normal [physical evaluation]."  Id.

## C. Testimonial Evidence

### 1.      Kutscher's Testimony

At the administrative hearing, Kutscher was represented by counsel and testified that he is unable to work due to his memory problems; his dislike of being around other people; anger issues; and pain in his back, neck, arms, and hands.  Tr. 43, 46-47.  Kutscher recalled working for an injection molding company in 1998.  Tr. 36.  He also testified to having worked as a dishwasher in 2000.  Tr. 66.  He stated that he has lost many past jobs due to his anger problems.  Tr. 55-56.  When asked about the various gaps in his employment history, Kutscher stated that he bounced around among different jobs and had a difficult time remembering where he had worked.  Tr. 45-46.  Kutscher testified that he experienced attendance problems at past jobs because he "didn't want to go to work."  Tr. 58.

Kutscher also testified that his psychiatrist and another practitioner told him that his drug and alcohol usage contributed to his anger problems.  Tr. 61.  He stated that a drug and alcohol assessment counselor told him that, he needed to stay away from alcohol or he could snap and "[g]o and kill a bunch of people."  Tr. 61.  Kutscher testified that he does not use "street drugs" and only drinks alcohol on his anniversary or holidays.  Tr. 63.

Kutscher testified that he has had a pinched nerve in his neck since he was hit by a truck in 1998 after which a plate was inserted into his neck.  Tr. 41.  Kutscher stated that pain in his spine prevents him from sitting for more than 20 minutes, standing for more than 30 minutes, and walking for more than 20 minutes.  Tr. 47-48.  He claimed that his hands will go numb at times if he is lifting things and he occasionally drops things that he is holding.  Tr. 49, 54.  He stated the he was taking Prilosec, Ventolin, Flovent, Zocor, tramadol, oxycodone, Lyrica, Klonopin, Saphris, valproic acid, and Seroquel, and that he was also using some sort of breathing

treatment.  Tr. 38.  He claimed that his medications make him tired.  Tr. 58.  When asked by the

ALJ if he could perform a job that allowed him to change his position between sitting and

standing and did not require heavy lifting, Kutscher stated he could.  Tr. 50.  Later, when he was

asked a similar question by his attorney he stated that he could not work such a job "with the

constant up and down."  Tr. 57.

Kutscher has a 10th or 11th grade education.  Tr. 36, 50.  He testified that he is a smoker.

Tr. 39-40.  In the course of a typical day, Kutscher testified that he watches television, cooks

simple meals, and sleeps because his medications make him tired.  Tr. 52, 58.   He also admitted

to having verbal fights with his wife and "throwing stuff across the room" during those fights.

Tr. 57.

### 2.    Vocational Expert's Testimony

Vocational Expert Dr. Nancy Borgeson ("VE") testified at the hearing.  Tr. 63-79.  The

VE testified that Kutscher's past relevant work as an injection mold tender was a light, unskilled

job, and his position as a dishwasher was medium and unskilled.  Tr. 67-68.  The VE testified

that Kutscher has no transferable skills from his past work.  Tr. 68.  The ALJ then asked the VE

to consider a hypothetical individual of Kutscher's age, education, and work experience who

could perform a wide range of work in which social interactions are limited; cannot be expected

to manage others or resolve conflicts; engages in simple and respective[5] [sic] tasks in a low-

stress environment, meaning that work is not fast-paced and there are no strict production

standards.  Tr. 68.  The VE testified that such a hypothetical individual could not perform

Kutscher's past work, although there would be other jobs the individual could perform such as

(1) industrial cleaner (15,000 jobs in Northeast Ohio; 75,000 Ohio jobs; and 750,000 national

jobs); (2) a stock handler or warehouse worker (7,500 jobs in Northeast Ohio; 37,000 Ohio jobs,

---

[5] The ALJ's RFC states that Kutscher could perform simple and *repetitive* tasks.  Tr. 17 (emphasis added).

and 780,000 national jobs); or (3) a laundry worker (600 jobs in Northeast Ohio; 3,100 Ohio jobs, and 75,000 national jobs).  Tr. 69.  The ALJ then asked the VE how long an individual could be off-task during the course of a workday without jeopardizing his job.  Tr. 70.  The VE estimated an individual could be off task no more than 7% of the time.  Tr. 70.

The ALJ then asked the VE to consider a second hypothetical individual with the following additions from the first:  the individual would be limited to sedentary work with a sit-stand option; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent gross manipulation with the dominant hand; and no exposure to temperature extremes. Tr. 70-71.  The VE testified that the individual could perform work as an assembler (2,100 jobs in Northeast Ohio; 10,000 Ohio jobs; and 150,000 national jobs) or a table worker (5,000 jobs in Northeast Ohio, 27,000 Ohio jobs, and 473,000 national jobs).  Tr. 71.  The VE also stated that, if the individual were limited to superficial contact, he could work as an order clerk (1,800 Northeast Ohio jobs; 9,700 Ohio jobs; and 215,000 national jobs) or a general office clerk (2,100 jobs in Northeast Ohio; 10,000 Ohio jobs; and 220,000 national jobs).  Tr. 72.

Kutscher's attorney then asked the VE to consider the second hypothetical individual raised by the ALJ but added the additional limitation that the individual should have no concentrated exposure to dust, fumes, gasses, or odors.  Tr. 73.  The VE testified that the individual could still perform work as an assembler or table worker.  Tr. 73-74.  Kutscher's attorney then asked the VE to again consider the second hypothetical individual raised by the ALJ but add the additional limitation that the individual could perform no more than occasional manipulation with the dominant hand.  Tr. 78.  The VE testified that the assembler and table worker jobs would not be available with that additional limitation.  Tr. 78.  The VE further

testified that there would be no sedentary, unskilled jobs for that individual because those jobs require more than occasional handling and fingering.  Tr. 78.

### III. Standard for Disability

#### A.  Initial Disability Determination

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making an initial determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to

determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his January 20, 2012, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since April, 28, 2010, the application date.[6]  Tr. 15.

2.      The claimant has the following severe impairments: bipolar disorder, post-traumatic stress disorder, anger management issues secondary to intermittent explosive disorder, polysubstance dependence (in full partial remission).  Tr. 15.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 16.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. The claimant can perform work that requires in which [sic] social interactions are limited (not expected to manage others or resolve conflicts), tasks that are simple and repetitive, stress that is low (i.e. not fast-paced), and without any strict production standards.  Tr. 17.

---

[6] Although the ALJ found that Kutscher filed for disability on April 28, 2010, Kutcher's application for SSI reflects a protective filing date of April 16, 2010.  Tr. 181.

5.      The claimant is unable to perform any past relevant work.  Tr. 20.

6.      The claimant was born in 1966, and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 20.

7.      The claimant has a limited education and is able to communicate in English.  Tr. 20.

8.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  Tr. 20.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform.[7]  Tr. 20.

10.     The claimant has not been under a disability, as defined by the Social Security Act, since April 28, 2010, the date the application was filed.  Tr. 22.


## V. Parties' Arguments

Kutscher argues that the ALJ erred by giving only "partial" weight to the opinion of his treating physician Dr. Gates.  Doc 17, pp. 11-14.  Kutscher also argues that the ALJ erred by not finding his physical impairments to be "severe" and not including limitations from those impairments in the RFC.  Doc. 17, pp. 14-17.  Defendant counters that there is substantial evidence to support the ALJ's decision.  Doc. 21, pp. 11, 17.


## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

---

[7] The ALJ listed industrial cleaner, stock handler, and laundry worker as examples of jobs the claimant could perform consistent with the testimony of the VE.  Tr. 21.

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d

679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*,

nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745

F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not violate the treating physician rule

Kutscher argues that the ALJ violated the treating physician rule by improperly weighing

the opinions of Dr. Todd Gates and by providing "faulty reasoning" for discounting those

opinions.  Doc. 13, p. 23.  Under the treating physician rule, an ALJ must give the opinion of a

treating source controlling weight if he finds the opinion "well supported by medically

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other

substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

(6th Cir. 2004) (quoting 20 C.F.R. §§ 404.1527(d)(2)).  If an ALJ decides to give a treating

source's opinion less than controlling weight, he must give "good reasons" for doing so that are

sufficiently specific to make clear to any subsequent reviewers the weight given to the treating

physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the

weight given, the ALJ must consider factors such as: (1) the length of the treatment relationship

and the frequency of the examinations, (2) the nature and extent of the treatment relationship, (3)

the supportability of the opinion, (4) the consistency of the opinion with the record as a whole,

(5) the specialization of the source, and (6) any other factors that tend to support or contradict the

opinion.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§

404.1527(d), 416.927(d).  "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting §404.1527(d)(2)).

The ALJ did not give controlling weight to Dr. Gates's opinions because the ALJ found that his opinions were inconsistent with other evidence in the case record.  Tr. 19.  Instead, the ALJ gave partial weight to Dr. Gate's opinions finding that the opinions were inconsistent with his own treatment notes because Kutscher is only "impaired to the extent that [Dr. Gates] describes in his assessment when [Kutscher] is not compliant with medical treatment or is temporarily faced with acute exacerbations of his symptoms, which require an additional interim counseling session and medication adjustment."  Tr. 19.  The ALJ's finding is supported by substantial evidence consisting of Dr. Gates's treatment notes demonstrating improvement in Kutscher's condition; the opinions of Drs. Warren and Marlow, who opined that Kutscher does not have work-preclusive limitations; and the ALJ's credibility determination regarding Kutscher's complaints.

Treatment notes.  As set forth above, Dr. Gates completed a mental status questionnaire ("MSQ") and a daily activities questionnaire ("DAQ") on January 26, 2011.  Tr. 383-87.  In the MSQ, Dr. Gates opined that Kutscher had "some trouble" in his ability to remember, understand and follow directions; "much difficulty" in his ability to maintain attention; impaired concentration and inability to stay on task or complete things in a timely manner.  Tr. 384.  Dr. Gates further opined that Kutscher would have "much difficulty" with social interaction, poor adaption skills, and could not handle work related stressors.  Id.  In the DAQ, Dr. Gates opined that Kutscher "cannot maintain employment" and is "unable to work."  Tr. 386.  He stated that

16

Kutscher's poor ability to concentrate, low energy, and depression would prevent him from work activities.  Id.

However, in his treatment notes from that same day, Dr. Gates stated that Kutscher's medications were working well and that "overall [he was] doing his best."  Tr. 416.  Treatment notes from the months prior to Dr. Gates's January 26, 2011, opinion show that Kutscher was responding well to his medications and that his anger and anxiety issues were under control. First, in July 2009, Dr. Gates assigned Kutscher a GAF score of 55, which reflects only moderate difficulty in social or occupational functioning.  Tr. 333.  In July 2010, it was noted that Kutscher experienced an "[a]cute grief reaction" after his wife left him but Dr. Gates recommended his "current medicines will be maintained unchanged."  Tr.  390.  Dr. Gates noted in September 2010 that Kutscher's medications seemed to be treating his anxiety and PTSD and that he was only having issues sleeping.  Tr. 392.  In October 2010, Dr. Gates stated that Kutscher was doing well after he and his wife reconciled.  Tr. 393.  In November 2010, Dr. Gates noted that Kutscher's medications were treating his mood swings, irritability, and bad temper.  Tr. 394.  Kutscher stated he was doing okay and requested no changes to his medications.  Id.

Following Dr. Gates's January 26, 2011, opinion, the doctor continued to note that Kutscher was doing well with his medications.  Tr. 417.   In June 2011, Dr. Gates increased Kutscher's prescription for Seroquel after a traumatic incident involving Kutscher's wife and a third party.  Tr. 424.  Dr. Gates did note however that, although Kutscher was very angry and upset, he "has enough insight to not act upon his rage."  Tr. 424.

Drs. Warren & Marlow   Dr. Gates's opinions are also contradicted by the opinions of the state agency psychologists Drs. Warren and Marlow.  Tr. 83-86, 380, 94-97.  The ALJ gave

"great weight" to the opinions of Drs. Warren and Marlow because he found those opinions were "consistent with [Kutscher's] longitudinal treatment history when he is compliant with medical treatment."  Tr. 19.  Both Dr. Warren and Dr. Marlow opined that Kutscher retained the capacity to perform low-stress work in which social interaction is limited and there are no strict production requirements.  Tr. 86, 97.  Dr. Warren further specified that Kutscher should only perform simple, repetitive tasks.  Tr. 97.   These opinions are consistent with the ALJ's RFC determination that Kutscher could perform a full range of work in which social interaction is limited; tasks are simple, and repetitive; stress is low; and there are no strict production standards.  The opinions of state agency psychologists are entitled to consideration under the same regulations used to assess other medical opinions, and may in some circumstances be entitled to greater weight than the opinions of treating or examining sources.  20 C.F.R. § 416.927(e); SSR 96-6p; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651 (6th Cir. 2006) (en banc) (affirming ALJ's decision adopting reviewing physician's opinion over treating physician's opinion).

Finally, the ALJ also considered Kutscher's subjective complaints and found that his allegations of disabling limitations were only "partially credible to the extent that he can perform simple and repetitive tasks in a low-stress environment with limited social interaction…"  Tr. 18.  The ALJ based his credibility assessment on the treatment notes which showed that when Kutscher is compliant with medication and counseling his mental functioning is limited only to the extent described in the previous sentence.  Tr. 19.  The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001); *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v. Commissioner of Social Sec.,* 127

F.3d 525, 531. On appeal, a reviewing court is "limited to evaluating whether or not the ALJ's explanations for [discrediting the witness] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476. As noted above, the ALJ's assessment of the mental health treatment notes was reasonable and the ALJ's decision to discredit Kutscher was supported by substantial evidence.

Based on all of the above, the ALJ stated good reasons for discounting the opinion of Dr. Gates and those reasons were sufficiently specific to make clear to any subsequent reviewer the weight given to those opinions and the reason for that weight. *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion). Here, Dr. Gates's January 26, 2011, opinions are inconsistent with his own treatment notes and with the other medical opinions.[8]

---

[8] Kutscher also argues that Dr. Gates's opinion is "further bolstered by the records from the Charak Center." Doc. 17, p. 12. However, these medical records were not before the ALJ when he rendered his decision. The Charak Center medical records are dated from June 2012 to September 2012. Tr. 438-481. The ALJ rendered his decision in January 2012. Tr. 10-26. These records were submitted for the first time to the Appeals Council. Tr. 4. Evidence submitted after the ALJ's decision "cannot be considered part of the record for the purposes of substantial evidence review." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir 1996)). Under 42 U.S.C. § 405(g) additional evidence submitted to the Appeals Council can be a basis for remand if there is a showing that the evidence is new, material, and that there was good cause for failing to present the evidence at the hearing. *Cotton v. Sullivan,* 2 F.3d 692, 695 (6th Cir 1993). Here, Kutscher did not make this argument and it is therefore waived. *See Stiltner v. Comm'r of Social Security*, 244 Fed. Appx. 685, 686 (6th Cir 2007) (holding that plaintiff waived the treating physician argument by not including it in her initial brief).

Furthermore, even if the Charak Center records had been made part of the record, the findings of the Commissioner would not be subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003); *Castello v.Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011) *report and recommendation adopted sub nom. Castello ex rel. Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011).

19

**B. The ALJ did not err by failing to account for any of Kutscher's physical impairments in formulating the RFC**

Kutscher argues that the ALJ erred in not finding any of his physical impairments to be severe and by failing to include any physical limitations in the formulation of the RFC.  Doc. 17, pp. 14.  Kutscher's argument is two-fold.  Kutscher first claims that the ALJ erred by not considering his bilateral cervical radiculopathy, bilateral lumbar radiculopathy, cervical post laminectomy, and carpal tunnel syndrome to the right wrist to be severe impairments.  Id.  Kutscher then argues that the ALJ erred because he did not account for the impact of her non-severe impairments in assessing his RFC.  Id.  The Court will first address Kutscher's severity argument.

**Severity.**  Plaintiff carries the burden of proving the severity of his impairments.  *Allen v. Apfel*, 3 F. App'x 254, 256 (6th Cir. 2001) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).  While step two has been described as a "*de minimis* hurdle," the severity requirement can be employed to screen out "claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 862–63 (citation omitted).  A claimant's impairment will be considered non-severe when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three.  Accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared. *Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir.2008) (citing *Maziars v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir.1987))*; Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803

(6th Cir.2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."). All of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. *See* 20 C.F.R. § 404.1545(e).

Here, at step two, the ALJ determined that Plaintiff's physical impairments were not severe. Tr. 15-16.  Kutscher argues that the ALJ erroneously failed to find that the following physical impairments were severe:  bilateral cervical radiculopathy, bilateral lumbar radiculopathy, cervical post laminectomy, and carpal tunnel syndrome to the right wrist.  Doc. 17, p. 14.  However, the ALJ determined that several of Kutscher's mental health impairments were severe:  bipolar disorder, post-traumatic stress disorder, anger management issues secondary to intermittent explosive disorder, and polysubstance dependence.  Tr. 15.  Upon finding the mental health impairments severe, Kutscher cleared step two of the disability analysis. *See Anthony,* 266 F. App'x at 457.  Accordingly, even if the ALJ erred in finding that Plaintiff's physical impairments were not severe, any error is harmless.[9]

**RFC analysis.**  Kutscher next argues that the ALJ erred by not accounting for the impact of his non-severe impairments in assessing his residual functional capacity.  Doc. 17, p. 17.  The proper focus for this Court's analysis is "whether the ALJ considered the *entire* medical record—including any claimed impairments—in determining the plaintiff's RFC."  *See* 20 C.F.R. §§ 404.1523 ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.") *Miller v. Astrue,* 2009 WL 3161456, at *2 n. 1; *Jamison v. Comm'r of Soc. Sec.,* 2008 WL 2795740, at

---

[9] For purposes of this opinion it is not necessary to determine whether the ALJ was correct in finding that none of Kutscher's physical impairments were severe.  As such, the Court makes no determination on this issue.

*9 (S.D.Ohio July 18, 2008).    This does not mean that the ALJ must employ a particular "combined effects" analysis.  *Brinegar v. Comm'r of Soc. Sec.*, 2014 WL 2154872 at *9 (citing *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)).  An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a "combination of impairments" in finding that the plaintiff does not meet the listings. *Loy,* 901 F.2d at 1310 (citing *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988)).  In fact, "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.2006).  The ALJ's decision must show, however, that the ALJ implicitly resolved conflicts in the record. *Id.*

The ALJ's decision contains a limited discuss of Kutscher's physical limitations in the RFC analysis section.  However, the decision as a whole, along with the hearing transcript, makes clear that the ALJ considered the entire medical record and "all symptoms" (Tr. 18) in determining the RFC.   For example, in the ALJ's step two analysis he engages in a credibility analysis of the physical impairments (Tr. 16) which normally takes place during the RFC analysis portion of the opinion.  The ALJ's decision to exclude physical limitations in the RFC is supported by the following substantial evidence.

As noted above, Kutscher argues that the ALJ should have included limitations relating to his diagnoses of bilateral cervical radiculopathy, bilateral lumbar radiculopathy, cervical post laminectomy, and carpal tunnel syndrome to the right wrist in the RFC.  Doc. 17, p. 15.  However, the mere diagnosis of an impairment says nothing about the severity of that impairment. *Foster v. Bowen,* 853 F.2d 483, 489 (6th Cir.1988); *See also Higgs v. Bowen,* 880

22

F.2d 860, 863 (6th Cir.1988) (mere diagnosis of a condition provides no indication as to the severity of the condition).

Kutscher fails to identify any specific physical limitations which should have been included in the RFC relating to those impairments.  Instead, he simply lists the diagnoses of the conditions and states that the conditions cause neck pain, leg pain, arm pain, and hand numbness. Doc. 17, p. 17.  Moreover, Kutscher does not cite to any medical opinion evidence or any treating source finding to demonstrate that those conditions cause any significant functional work-related limitations.  The only medical opinion evidence in the record relating to Kutscher's physical impairments is from state agency physician Dr. Das, who opined to the contrary - that Kutscher's physical impairments cause no functional limitations to his ability to work.  Tr. 380. Accordingly, the ALJ did not err by failing to account for physical limitations in the RFC. *Troxell v. Comm'r of Soc. Sec.*, 1:10-CV-755, 2012 WL 289933 (S.D. Ohio Jan. 31, 2012) *report and recommendation adopted,* 1:10-CV-00755, 2012 WL 664770 (S.D. Ohio Feb. 29, 2012) (finding that the ALJ did not fail to account for a condition in formulating the RFC where there was a lack of evidence that the condition limited plaintiff's work abilities).

In addition, the hearing transcript shows that the ALJ appropriately considered Kutscher's reported physical symptoms for purposes of formulating the RFC.  Tr. 70.  At the hearing, the ALJ asked the VE two hypothetical questions.  The first hypothetical posed by the ALJ did not account for any of Kutscher's reported physical limitations.  Tr. 68.  The second hypothetical posed by the ALJ included psychological limitations from the first hypothetical and physical limitations including:  sedentary work with a sit-stand option; no ladders, ropes, or scaffolds; occasional ramps and stairs; frequent gross manipulation with the dominant hand; no

exposure to temperature extremes.[10]  Tr. 70-71.  At the end of the day, however, the ALJ adopted

an RFC that included no physical limitations, which was supported by substantial evidence in the

record as discussed below.

In his decision, the ALJ acknowledged and discussed Kutscher's physical impairments

and cited to the medical evidence relating to those conditions.  Tr. 15-16.  The ALJ even

discussed some of the relevant medical evidence during the administrative hearing, e.g., "[The

June 2011 MRI] showed me there was [sic] no significant issues…And then there was a nerve

conduction study at 12F-7 that shows possibly right carpal tunnel syndrome, and it said all other

nerves were normal."  Tr. 40.  However, the ALJ ultimately found that the limiting effects of

Kutscher's physical impairments were not credible due to lack of treatment and based on

Kutscher's reported activities.  Id.  For example, the ALJ noted that, despite a diagnosis of carpal

tunnel to the right wrist, Kutscher had never received any medical treatment for that impairment.

Id.  The ALJ also noted that Kutscher's diagnosis of cervical radiculopathy "secondary to a

remote cervical fusion that was performed in 1998" did not produce the limiting effects Kutscher

claimed.  Tr. 16.  The ALJ noted the minimal medical treatment consisting of pain medications

and steroid injections and considered objective tests performed which showed largely normal

results.  Id.  The ALJ also pointed out that Kutscher had recently started chopping wood as a

hobby.  Id.  Kutscher does not challenge the ALJ's credibility determination, to which this Court

affords considerable deference. *See Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918,

920 (6th Cir.1987); *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th

Cir.1987).  Accordingly, the ALJ's credibility determination provides substantial evidence in

support of the ALJ's decision to exclude physical impairments from the RFC.  *See Harvey v.*

_____

[10] Notably, the VE testified that, even with those physical limitations, the hypothetical individual could still perform work as an assembler (2,100 northeast Ohio jobs; 10,000 Ohio jobs; and 150,000 national jobs) and a table worker (5,000 northeast Ohio jobs; 27,000 Ohio jobs; and 473,000 national jobs).

*Colvin*, 5:12-CV-2026, 2013 WL 1500688 at *12-13 (N.D. Ohio Apr. 10, 2013) (Finding that the ALJ's credibility determination relating to a non-severe impairment provided substantial evidence to support the ALJ's decision to exclude limitations related to that impairment from the RFC).

Finally, the ALJ gave "great weight" to the opinion of Dr. Das which, as discussed above, was the only medical opinion in the record relating to Kutscher's physical impairments and which concluded that Kutscher's physical impairments did not cause any functional limitations.  Tr. 19, 380.

Based on all of the above, the ALJ's decision makes clear that, consistent with the regulations, the ALJ considered evidence of all impairments, physical and mental, when formulating the RFC.  See 20 C.F.R. §§ 404.1523, 404.1545(a)(2); *see White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 787 (6th Cir. 2009) ("Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."). The ALJ's decision not to include limitations based on physical impairments in the RFC is supported by the ALJ's thorough discussion of all of Kutscher's impairments, the ALJ's credibility analysis, and the ALJ's providing "great weight" to the opinion of Dr. Das.


### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision**.**


Dated:  August 8, 2014

_____
Kathleen B. Burke
United States Magistrate Judge